Lodestar v. Austin Nichols Mr. Brookie, good morning. Please proceed. Good morning, thank you, Your Honor. I can't please the Court. The issue before the Court this morning is whether the mark Wild Gates is confusingly similar to the mark Wild Turkey. The Board found that there was such confusing similarity, and the Board's decision to be affirmed must be supported by substantial evidence as to the factual findings. If the Court reviews the legal conclusion of confusion, ultimately, that's a question of law. We believe that the Board's decision was not based on substantial evidence, and for the most part, was not based on any evidence. Because the DuPont factor findings, do you think, was based on evidence that is so minimal as to be called less than substantial by us? Your Honor, that DuPont factor is a similarity of the two marks, and that's the focus of our argument this morning, and also the focus of our briefs. And we believe that the lack of similarity here is dispositive. Any one DuPont factor that's been long settled can be dispositive, and we believe that this factor is in the case before the Court this morning. Yeah, but the question is whether their finding about the commercial impression, et cetera, being similar, has practically no evidentiary support. It looked to me like there was lots of evidence. Well, I'd like to discuss that, Your Honor, because we... You can assess the evidence differently, perhaps, but there was lots of evidence there. The Board's opinion doesn't cite specifically any evidence in the record, and to put this in the framework in which we find the case, what the Board said is that the connotation of commercial impression of the mark of wild turkey was not of wild turkey itself, but was of wild plus game bird. That was the Board's finding. I don't think that's a fair statement at all. You're asking me where is the opinion. That's what their conclusion was. It's true that there was a statement along that line, but that wasn't the extent of their finding about similar commercial impressions. Your Honor, on page 22 of the opinion, the Board states that the similarity of the marks continues after discussing the first part of the mark, which is wild, with a second word in each mark being a game bird. Right. And then on page 26, the Board states, we consider the similarity of these marks with the word wild is followed by the name of a game bird to be significant. So we do think that is the foundation on which the Board's opinion rests. And what we don't see... But where's the lack of evidence? They looked at the application, and they looked at all the prior marks of the opposing. And they looked at the exact trademark sought to be registered. That's what they're supposed to look at. That's all evidence. What's less than substantial about that considerable documentation? Your Honor, the evidence that is missing is the leap from wild turkey to wild game bird, to take something beyond what's in the mark itself and construe it further. And if you're going to do that and you're going to take the mark and say the connotation and commercial impression are more than what the mark literally conveys, there has to be evidence of that. And the evidence in the record consistently emphasizes that the wild turkey is a literal animal. That is what is in the record. I've scoured this record, Your Honor. I don't see any references in there. There are 40 years of advertisements and decades of opposition proceedings initiated by Austin Nichols to game birds generally. It's not in there. We're not nitpicking every sentence in a lengthy opinion by the Trademark Trial and Appeal Court. We're trying to find out whether their conclusion had to be wrong because on a primary DuPont factor, they got the evidence upside down and backwards. That's what you're saying they did. That's exactly right, Your Honor. That's what we're saying we did. If you're going to go beyond what the word says and look at the connotation and commercial impression, it is up to the registrant, asserting confusion, to come forward with evidence that the opposer bears the burden of proof and showing the likelihood of opposition. As I understood it, what the position of Austin Nichols here was that its wild turkey mark, the way it's used on bottles and in advertising, is evocative of the outdoors, hunting, fishing, camping. They have a line of camping goods and so forth. And the idea is that one would naturally think that they see wild goose, that wild turkey, Austin Nichols, the same company, is branching out into that. I mean, that's the context in which Game Bird came up. I believe that's true, Your Honor. I think that actually raises two separate related issues. The first is this evocation of the outdoors. Where is the line drawn then? If you're going to say that that's the case and the wild turkey is evocative of the outdoors or hunting or fishing, then would wild fish hook or wild campfire be confusingly similar, or is that the connotation? There has to be a line drawn here somewhere as far as where the trademark rights began and end. And if they're going to take it beyond wild turkey and wild game goods generally, then there has to be evidence. There's nothing in the record that indicates that wild turkey or Austin Nichols is sponsoring quail hunts or dove hunts or pheasant hunts. It's about turkey hunts, turkey shoots, turkey calls. Everything we have done to brand this market to create a connotation and commercial impression on the public relates to this turkey imagery. John Conway, the in-house counsel for Austin Nichols at his deposition, acknowledged that in the marketplace we are sometimes referred to as just turkey. We prefer to use the wild turkey name because that's our brand. But that's kind of how we're known in the marketplace, and we have worked hard to build that image. We spent a lot of time and money in building that turkey image. There's no similar statement in the record that's not accurate. I don't understand what you're saying. You seem to be saying the board is not entitled to draw any inferences at all from the testimony of the opposing witnesses, that the board somehow just literally looked at individual scraps of testimony and said it can't weave them together. It can't draw inferences. It can't use common sense. It can't use the expertise they have as trademark attorneys. That just seems like a preposterous position to be taking. Well, Your Honor, the federal circuit in Bo's case said you have to have evidence to support the connotation of commercial impression on which you're basing your claim of confusion. Again, in this context, how are you going to construe that evidence? There isn't any evidence in the record. Not a question of construing it. Evidence doesn't get construed. Statutory language gets construed. Evidence gets assessed, and you draw inferences from the primary fact to deduce secondary or tertiary facts. That's how you do it. I don't see how that's improper. Your Honor, I think they drew a line at where this trademark protection ended, and they drew it leaving arbitrarily in the record. It's not even internally logically when they said that the mark is wild followed by the name of a game bird. Because the second word is turkey. That's not even a game bird in the absence of the word wild. It's just it's not internally logical. It's not supported by anything in the record. Look, the issue here is whether wild geese for drinks is too close to wild turkey for drinks. That's correct, Your Honor. And you have to look at the connotation of commercial impression of Bo. And we've been talking about the connotation of commercial impression of wild turkey. We don't think this will change the evidence in the record. We're going to be looking at the legal conclusion denotable from the evidence that the court should reverse the board's finding in that regard. But the second problem with what the board did in connection with connotation of commercial impression is an argument. We didn't examine the wild geese mark at all. What the board said was, having decided that the mark is wild plus game bird, all we need to do is look at the wild geese mark and see if we find a game bird in there. And if so, that's it. The evidence of record on the connotation of commercial impression of wild geese actually doesn't relate to the literal animal at all. There are several cases in the record where there are references to the wild geese as a group of Irish immigrants. So you're saying we should reverse the board because even though the mark is wild geese, wild geese really means Irish mercenaries. And therefore, we should ignore wild geese because we should substitute for that Irish mercenaries. And there's no similarity between wild turkey and Irish mercenaries? Your Honor, I think that what we should do, what the court should do, is look at the actual connotation of commercial impression of the wild geese. We should engage in fact-finding? We should pretend that we're trademark attorneys? Well, the board did not even look at the evidence. It's not discussed the evidence of connotation of commercial impression. The packaging, the labeling, the advertising that all tell the story of these Irish soldiers. But it's not like it didn't look at the evidence. There's no reference point. There's no basis in saying that. Your Honor, there's nothing in the board's opinion that says they considered- That's a very different matter. You're right. All opinions leave out masses of the evidence because otherwise they'd be thousands of pages long. So you cannot draw an inference that certain evidence is not discussed in the opinion that the adjudicators didn't look at that evidence. That's absolutely impractical. Okay. I apologize, Your Honor. I didn't mean to imply that they shirked their view. What I meant to suggest, though, is that when they were looking at wild geese, there's nothing in the opinion that discusses the evidence of record on the actual connotation of commercial impression. The analysis of the board was simply having decided that the mark is wild goose game. All we need to do is look at wild goose geese and ignore or we don't even need to discuss the evidence of record with regard to the actual connotation of commercial impression. And we believe that that is error. We believe that that is not based on substantial evidence. There's no evidence of record. But what is the logic of what you're saying, that they didn't discuss things thoroughly enough and therefore you should win? Your Honor, I think you're going to look at whether there's enough evidence in the record to support the board's opinion. We see nothing on the one side that discusses the game bird imagery or evocation on behalf of Austin Nichols with regard to the wild turkey mark. If you look on the wild geese side, we see no evidence in there that suggests or evokes game birds generally. We do have evidence that says, look, the connotation of commercial impression of the wild geese mark is of these Irish members of sort of a diaspora that immigrated to the European continent. That is not – that factor is not discussed in the board's decision. The board does not point to evidence of record that supports the game bird decision. But how many people when they hear wild geese are going to think of that? You have to be – there were those two movies. That's right, Your Honor. That came out. That's true. And the wild geese was a reference to mercenaries in Africa. But how many people are going to – if they see a bottle of liquor with a bird on it, are going to think of the mercenaries? Well, Your Honor, the – it's not just a bottle of liquor with a bird on it. The story is actually printed on the bottle, on the label on the bottle. We actually have a box on the bottle here if the court wants to examine it. But it is in terms of the connotation of commercial impression of what's actually put out to the public, the wild geese. Well, why then not? If that's the case, then why not use a mark with a mercenary on it or an Irish soldier? A picture of, you know, Roger Moore or someone evocative of a mercenary. I think we might have a different problem if we use Roger Moore's photo. But, I mean, the selection of the word mark, wild geese, and as it appears on the labels that even though it's not part of the word mark, it's accompanied by the wild geese referring to a specific group of people. I wasn't involved in the selection of the imagery. The geese flying in formation obviously are a tour of mind and, I believe, to load service mind. Metaphoric, that's how the term began in the first place, was the wild geese migrating and returning home as geese do in their migratory cycles. So that is not – I don't think that's not the issue in which the case turns, is whether there are soldiers in the bottle versus geese. The problem would be a problem if there were soldiers in the bottle. Your Honor, again, we discussed Officer Nichols' approach towards trademark issues. We think we might still have a problem with them even if we did have soldiers on the label. But the fact of the matter is we don't have a record. Is any advertising material or any labeling, any promotional material on behalf of Officer Nichols in 40 or 60 years that even discusses this issue of anger? We believe the Board did not base its finding of a game bird connotation on substantial evidence. And we think the Board heard in not giving sufficient weight, if any weight, to the actual connotation and personal impression of the wild geese mark as evocative of not animals at all, but of the desire for soldiers. Do you want to speak into my rebuttal microphone? Yes, thank you. My name is Louis Etterer, and I represent the L.A. Austin Nichols. I'd like to put this wild geese, Irish soldiers of fortune argument to rest before I can get into my argument. There is no evidence in this record that wild geese means Irish soldiers of fortune. That's something they put in their brief. They put in no evidence whatsoever in this proceeding. There was that movie, but there's no evidence in the record about that. Assume for the moment they did have a bottle instead of – it was called wild geese, but they had an Irish soldiers of fortune or mercenaries on it. Would there be a case? Yeah, absolutely. Because the issue is the connotation to American consumers, reasonable American consumers, about what the term wild geese means. And so what the term wild geese means has to do with their impression, mental impression that the consumer has from that term. And on top of that, there is no evidence whatsoever in this record that wild geese refers to Irish soldiers of fortune. There was an argument made like that in one of the Spice Islands cases where the appellant argued in the Spice Islands case that everybody knows that the Spice Islands are the Molucca Islands north and east of Indonesia. And the court said nobody knows that, number one. And number two, there's no evidence in the record to support that. So how broad is the wild term? Undomesticated game birds, we get all of them. Well, okay. I mean, interesting question. I think the answer to that question is it's up to the consumer. But the point is maybe there's some game. So what evidence did you have in the record here that the consumer would come to the PTP? It has to do with the imagery that's brought to bear by the advertising materials that we put in and all the branding that we do with respect to this product. It has to do with the fact that we have a game bird. People know what game birds are. There's evidence of that in the record. These are birds that are hunted for sport. You're talking about two of maybe the three game birds that people know the best, geese, turkeys, and maybe ducks. Everybody knows that. Now, we have all of this imagery about the outdoors, about hunting, about the natural, rustic environments. It's all of this imagery that goes into the question of what this means to people. And so maybe if there's a game bird that people don't know what it is. I looked it up this morning. I wrote it down. You could name something not a game bird. It could be wild sparrow or what have you. Well, maybe. And maybe we'd bring that case, or maybe we wouldn't. And the issue in that case would be whether the overall connotation of the two marks is sufficiently similar given all of the other confusion factors. But in this case, involving wild geese and wild turkey, two of the perhaps three most recognized game birds. With all of the other imagery that's going on here. The question about whether there's evidence in this record. We put in all the evidence. They put in absolutely nothing. There's mountains of evidence about what this all means to the average consumer. And in this case, maybe you're right. Maybe we wouldn't win in the case of wild sparrow. Maybe we would. But that's not this case. Game birds, a goose is closer to a turkey than a sparrow. And it's closer to a turkey than a horse. And it's closer to a turkey than a cherry. Because one of the third party marks that they put in here was wild cherry. Supposedly to show that the word wild was weak. There's a quote out of one of the Spice Islands cases that says that the court is not impressed with some of the third party uses that were put in. Because none of them is as close in connotation to Spice Islands as whatever the mark was. I think it was Spice Valley in that particular case. That's what we have here. So I agree with you. Wild sparrow might be a further step away. Wild horse is another step away. But that's not what we're talking about here. We're talking about the first application in 60 years where someone tried to register another mark using the word wild. Common word with our mark. And a game bird that's closely associated with this very small subset of birds that we're talking about. For the same class of goods. For the same class of goods. In fact, in this case, for the very same product. Our product, our basic product is a whiskey. Their basic product is a whiskey. So this is all about connotation. Obviously, we don't have evidence to show in this record that our advertising is about wild geese. Because that wasn't our mark. Our mark was wild turkey. Mr. Brookie is suggesting that we should have some evidence in there that shows that people should understand that wild turkey means wild geese. We wouldn't have that. But we do have all kinds of advertising that evokes the same kind of imagery. And that's what gives the consumer the connotation that we're talking about. It's the same source. Absolutely. And that goes to this other issue which we talked about in our brief. And which there's plenty of evidence in the record on this. And the board cited this evidence. That in the alcoholic beverage industry, line extensions are prevalent. When you have a very famous mark. When you have a mark that is well known. And consumers, it's a popular brand. Then you come out with line extensions. And that's what we did. We have come out with line extensions for wild turkey. And the board recognized that it's very possible, just as this court recognized and the board previously recognized in the Blue Nun cases. And in the Tia Maria cases. That the mark that we're talking about could very well be seen as a line extension of the basic product. The court in the Blue Nun, Blue Chapel case says that consumers encountering Blue Chapel would reasonably assume that this product came from the same producer as Blue Nun. And in the Tia Maria case, the board held that even purchasers who remember the original famous brand as Tia Maria. Might assume because of the similarity in the connotation of the marks. That Tia Lola was a special designation of the producer of Tia Maria for a line extension. That's what we're talking about here. It's very prevalent. It's well known. It's been in the case law for 30 years at this point. Wild duck would be next. Wild duck. I would say that. Or a line extension. Absolutely. Maybe we get to wild sparrow someday but I kind of doubt it. I think that we're talking about this very sort of outdoorsy type of imagery. Now, they're saying that we're trying to extend this, our trademark rights improperly. To go beyond just wild turkey and go to all game birds. And we've dealt with that. If any party is overreaching here, your honors, it's the advocate. They're the ones who are trying to get the court to disregard all the other confusion factors and focus only on similarity. They're the ones who are trying to dissect this mark into two. They want to throw out, they want to split the marks into two. We don't need to spend time critiquing the other side's style of argumentation. The important thing is what your evidence shows. I'm very effective at summarizing that. Well, thank you, your honor. All I'll say is, and I was going to end with this, is you raised this issue of whether there's substantial or sufficient evidence in the record. If you read this decision, there's all kinds of citations to the record. We put in mountains of evidence to support our case. The evidence was duly considered by the board, and the board ruled on it, and there's substantial, we tested substantial evidence, and there's certainly more than substantial evidence here for it to have decided the way it did. Thank you. Mr. Brookie will give you two minutes for rebuttal. Thank you, your honor. Mr. Edwards said that there's no evidence in the record of the commutation of commercial oppression. That's what I think I heard him say with regard to the Irish soldiers, and that's simply not true. In the Record Act, for example, pages 2049 and 2051, there's a discussion of the unique Irish story of the wild beast, the name for the Irish mercenary army that migrated from their own land-forming armies for hire as a discussion of the wild beast listing. There's also an advertisement on page 2054 of the record that again shows the label with the tagline, With each new generation, there's a new legacy. Raise your glass and remember them. And the Federal Circuit found in the specialty brands versus coffee bean case that it's appropriate to look at the trade dress that is being used in connection with democracy, whether that has an effect on profusion. We believe the trade dress was applied so heavily on this wild geese imagery outweighs any possibility of profusion. This is not a fact that was discussed in the record, and I don't believe that the board was correct in automatically conveying this connotation from wild geese to original wild geese. I think the case law requires affirmance, even if there's evidence, even considerable evidence, or contrary, so long as the evidence, some word of the decision of the board rises to the level or exceeds the level of substantial. The fact that you have some evidence on your side doesn't entitle you to win. We don't see any evidence in the record that shows that wild geese automatically conveys that the game bird and the evidence that Austin Nichols sides with that proposition is its own evidence with regard to the wild turkey mark, not evidence related to the wild geese mark. The only evidence in the record on the latter part, even if wild turkey can be extended to game bird, is of these Irish soldiers. And we can't get away from the fact that turkey is the dominant part of the mark. It is what's being marketed by Austin Nichols. They admitted that it's a dominant part of the mark in one of the exhibits that's before the court this morning. They're just wrong when they say that's not the case. But we do not believe that there is support in the record evidentially, or enough evidentiary support for the board's factual findings that we believe that as a matter of law, the NOAA would review this part of the verse. I think we have your case clearly won.